```
                    UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF ALABAMA
                           Southern Division
```

DONALD DODSON AND JEFFERY   )
WHITE,                      )
       Plaintiffs;          )
                            )
-vs.-                       )     No. CV-98-P-2944-S
                            )
NEW PROCESS STEEL CORP.,    )
       Defendant.           )

## OPINION

The following motions are pending in this case: 1) Defendant's August 31, 1999 Motion for Summary Judgment (docket no. 12); 2) Defendant's September 1, 1999 Motion to Dismiss Claims of Jeffery White (docket no. 11); 3) Defendants' Motion to Supplement the Record (docket no. 24); and 4) Plaintiff's Motion to Strike Defendant's Motion to Supplement Record (docket no. 25). Oral argument was heard in chambers on December 12, 1999. After careful consideration, the court has concluded that Defendant's motion for summary judgment is due to be granted in part and denied in part; Defendant's motion to dismiss is moot; Defendant's motion to supplement is due to be granted; and Plaintiffs' motion to strike is due to be denied.

## Facts[1]

New Process Steel, a company that processes and distributes metal products, has a production facility in Fairfield, Alabama. Plaintiffs are African-Americans who were hired by

---

[1] The recitation of facts is presented in the light most favorable to Plaintiffs.

1

Defendant to work in the Fairfield facility. Plaintiff Jeffrey White was hired on November 28, 1994, into an entry-level position. Plaintiff Donald Dodson was hired as a 'bander' on March 31, 1997. Until September, 1997, Bill English was the plant manger at the facility. At that point, he was demoted to plant superintendent and replaced by James Caraway.

On February 17, 1998, Plaintiff Dodson was injured on the job. After receiving medical treatment, he was required to undergo a 'drug screen' for the presence of illegal drugs in his system. New Process contracted with WorkWise, an independent testing company, to screen its employees for drugs. One week after the test, he was told by Caraway that his drug test had come back positive for marijuana and he was terminated.

Dodson then told Caraway that a white employee, Jeremy Pickle, had tested positive for marijuana a year earlier and had not been terminated. Caraway then investigated Dodson's allegations and discovered that Pickle had failed a post-accident drug test on January 16, 1997. Pickle's personnel file contained no documentation of the failed test or of any disciplinary action regarding the positive test. Caraway discovered that the results of Pickle's test had been reported by WorkWise to Bill English, who had been plant manager at the time of Pickle's test.

When confronted by Caraway, English at first denied knowledge that Pickle had failed the test. See English Dep. at 67-68. However, English eventually admitted to Caraway and to General Manager Dave Conway that he did not discharge Pickle when he had tested positive for marijuana. New Process then placed English on probation and required him to forfeit three weeks of accrued vacation.

In early March 1998, Caraway ordered all employees to submit to a random drug test. At that time Plaintiff White and a white employee named Bobby Pickle tested positive for controlled

2

substances and were discharged. New Process then reviewed its drug testing policy and determined that seven employees at the Fairfield plant had tested positive for drugs. Plaintiffs were the only African-Americans who tested positive; the others were white employees.[2] All of them except Jeremy Pickle, who failed to return to work after the March drug screening, were discharged by Defendant for drug use. Defendant claims that if Pickle had not abandoned his job, he would have been terminated for failing the 1997 drug test. See Def.'s Ex. 6 (Aff. Of Michael Vaughn).

Plaintiffs allege that during their term of employment at New Process, they were subjected to a racially hostile work atmosphere. The hostile atmosphere arose from racially-biased comments and slurs by their co-workers and supervisors; racial graffiti scrawled on the bathroom walls; defacement of their hard hats with racial epithets; and treatment by managers that singled them out from white employees.

White alleges that two of his white co-employees (Philip Martin and Michael Higgins) repeatedly called him "nigger," said "black men can't come to Oak Grove[3]," and that Higgins had spit on his boots. On May 9, 1996, both Martin and Higgins left the Fairfield facility.

White also alleges that Randy Little, his supervisor, called him "nigger" and other derogatory names. He testified at his deposition that Jesse Reese, another supervisor, gave him

---

[2]According to the defendant, the white employees who tested positive for drug use are as follows: Jason Hooper (discharged January, 1993); Tim Harrison (discharged November, 1993); Bobby Pickle (discharged March, 1998); and Jeremy Pickle (discharged March, 1998 for job abandonment). In its brief Defendant also states that Brian Pickle was discharged for a positive drug screen, but does not present evidence of the date of or reasons for his discharge.

[3]Apparently a predominantly white area of Birmingham.

3

a "setup sheet" every day that had racial epithets on it.[4] White also claims that when they were required to work through lunch one day, Little brought his brother something to eat. White says that he asked him why he "didn't bring the black guys any," and Randy replied "I've got to look out for my own."

    At his deposition, Dodson testified that he too was called racially derogative names such as "Nigger," "Leroy," "Lamont, and "Elmo" by Little and Sandy DeLara, two managerial employees. Both Plaintiffs claim that they observed racial epithets such as "Nigger," "White Power," "Klan Rules" drawn on and carved into the bathroom walls. After six months at the facility, White complained about the graffiti to the Maintenance Supervisor, and then to his immediate supervisor, Randy Little. See Dep. at 44. White also complained to Bill English, and later to Caraway about the graffiti. Caraway had the walls painted over and put up a sign stating that if the graffiti continued to appear, management would install a video camera in the bathroom. See Dep. at 124-25.

    Plaintiffs claim that on a number of occasions, their hard hats were stolen, and were returned with words such as "KKK" or "Nigger" carved into them. White states that one time his hard hat was burned. In his deposition, he admits that when his hard hat was defaced, Little responded by replacing it. See Dep. at 54.

    White also alleges that when he took three days to attend his wife's grandmother's funeral, he was required to provide documentation regarding the death, while white employees who took time off for funerals were not required to provide proof.

---

[4]White testified that often when he received the setup sheet from Reese, comments such as "no disk black boy," and "no disk dumb ass" would be written on it. See Dep. at 119-20.

4

On March 13, 1998, Plaintiffs brought charges of discrimination with the EEOC. They received their Notices of Right to Sue on August 31, 1998, and on November 25, 1998, filed suit in this court, bringing three claims of race discrimination under Title VII and § 1981: disparate treatment in termination; hostile work environment; and retaliation.

### Analysis

#### Defendant's Motion to Dismiss

On September 21, 1998, Plaintiff White filed for bankruptcy. On his personal property schedule, he listed his discrimination claims in this case. See Def.'s Ex. D. Defendant moves the court to dismiss the claims of Plaintiff White on the grounds that he lacks standing to pursue his claims, because a bankruptcy trustee succeeds to the causes of action held by the debtor. See Jones v. Harrell, 858 F.2d 667, 669 (11th Cir. 1988).

Plaintiff White filed a Response to Defendant's Motion to Dismiss/ Alternate Motion to Substitute. Recognizing that as a debtor he can not pursue his claims on his own behalf, he requested that the court substitute David. P. Rogers, Jr., trustee of the bankruptcy case as plaintiff in this action. In chambers, the parties agreed that Rogers is due to be substituted for Plaintiff White; therefore, Defendant's motion to dismiss is moot.

#### Defendant's Motion to Supplement/ Plaintiffs' Motion to Strike

On December 8, 1999, Defendant requested that the court supplement the evidentiary record with excerpts from Plaintiffs' depositions in response to Plaintiffs' submission. This motion is due to be granted. Plaintiffs' motion to strike Defendants' motion to supplement (in essence,

5

a response to Defendant's motion) is due to be denied.

Defendant's Motion for Summary Judgment

A. Termination Claim

Plaintiffs have brought their claims for intentional discrimination under both Title VII and § 1981. The test for intentional discrimination is the same under both Title VII and § 1981. See Watson v. Fort Worth Bank and Trust, 487 U.S. 977, 986 (1988); General Bldg. Contractors Ass'n v. Pennsylvania, 458 U.S. 375, 391 (1982). Therefore, a plaintiff whose Title VII claims fail to meet the standards for summary judgment necessarily cannot proceed under § 1981.

Plaintiffs can prove intentional discrimination by presenting direct evidence of a decisionmaker's discriminatory intent, see Buckley v. Hospital Corp. of America, Inc., 758 F.2d 1525, 1529-30 (11th Cir. 1985), or by stating a case based on circumstantial evidence. See McDonnell-Douglas Corp. v. Green, 411 U.S. 792 (1973). Plaintiffs have not presented direct evidence that New Process discriminated against them when they were terminated for marijuana use, such as a discriminatory statement by a decisionmaker in the context of the employment decision. Therefore, to state a claim of disparate treatment based on circumstantial evidence, Plaintiffs must present substantial evidence of all of the elements of a Title VII claim: (1) they belong to a protected class; (2) they were qualified for their positions; (3) they suffered an adverse employment action and (4) this adverse decision was causally related to the status of Plaintiffs as members of the protected class. See Jones v. Firestone Tire and Rubber Co., 977 F.2d 527, 537-38 (11th Cir. 1992).

The McDonnell-Douglas test affords an employer the opportunity to articulate a legitimate,

nondiscriminatory reason for the employment decision to rebut the presumption of discrimination raised by a plaintiff's prima facie case. See Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981). Thereafter, the burden of proof shifts back to the plaintiff to show that the asserted reason was a pretext for discrimination. See St. Mary's Honor Center v. Hicks, 509 U.S. 502, 515 (1993).

To state their prima facie case of disparate treatment in disciplinary action, Plaintiffs must present credible evidence that "the misconduct for which [they were] discharged was nearly identical to that engaged in by an employee outside the protected class whom the employer retained." Nix, 738 F.2d at 1185 (quoting Davin v. Delta Airlines, Inc., 678 F.2d 567, 570 (5th Cir. 1982)). As evidence of disparate treatment, Plaintiffs argue that white employees such as Jeremy Pickle, Randy Little, and Bill English were found by New Process to have committed terminable offenses, yet were not terminated. However none of these employees are similarly-situated to the plaintiffs.

Plaintiffs have not presented sufficient evidence for a reasonable jury to conclude that they were similarly-situated to Jeremy Pickle because the employment decisions were taken over a year apart and by different supervisors. The Eleventh Circuit has recognized that disciplinary measures taken by different supervisors suggests "a basis other than race or sex for the difference in treatment received by two employees" Cooper v. City of North Olmstead, 795 F.2d 1265, 1271 (6th Cir. 1986); quoted in Jones v. Gerwens, 874 F.2d 1534, 1541 (11th Cir. 1989); see also Jones v. Bessemer Carraway Medical Center, 137 F.3d 1312, n. 7 (11th Cir. 1998) (noting that "[d]ifferent supervisors may have different management styles that– while not determinative– could account for the disparate disciplinary treatment that employees experience").

7

During the time between Pickle's and Plaintiffs' drug tests, English, who gave Pickle a free ride, was replaced by Caraway, who terminated Plaintiffs. Plaintiffs have not submitted any evidence that Caraway's decision was racially motivated. On the contrary, Caraway's actions in investigating Dodson's charges that Pickle had not been terminated, testing all employees in the facility, and in repainting the bathrooms when Plaintiffs complained of the graffiti strongly suggests that Caraway would not tolerate racial discrimination at New Process. The evidence shows that at least two white employees were terminated by Defendant in 1993, and that the March 1998 drug tests were administered by Caraway in a non-discriminatory manner which resulted in the termination of one black employee (Plaintiff White) and one white employee (Bobby Pickle).

Plaintiffs also allege that Defendant's failure to terminate Little, when he twice came to work smelling of alcohol, and English, for lying to Caraway about Pickle's drug test, is evidence of racial discrimination in Plaintiff's termination. The evidence tends to show, however, that Caraway investigated the incidents with Little and determined that termination was not an appropriate disciplinary action, but did, on one occasion, discipline Little.[5] English is not similarly-situated to Plaintiffs because his misconduct is not "nearly identical" to that engaged in by Plaintiffs, see Nix, 738 F.2d at 1185. Plaintiffs have not presented credible evidence from which a reasonable jury could conclude that New Process intentionally discriminated against them by terminating them for misconduct. Accordingly, summary judgment is due to be granted on

---

[5]Caraway testified that on one occasion, Little had come to work smelling of beer. Caraway investigated the incident and determined that Little had most likely spilled beer on his clothes while taking out the trash, and at the time, was not intoxicated. See Dep. at 113-17. On the second occasion, Little came back from work with alcohol on his breath and told Caraway that he had had a beer at lunch; Caraway suspended him for one day. See Dep. at 118-20.

8

their termination claims.

B. Hostile Work Environment

To succeed on a claim of discrimination based on a hostile work environment, Plaintiffs must show that the conditions of the workplace were objectively abusive and hostile. "When the workplace is permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." See Harris v. Forklift Systems, 510 U.S. 17, 21 (1993); Edwards v. Wallace Community College, 49 F.3d 1517, 1521 (11th Cir. 1995).

White testified that racial slurs were used on a regular basis by co-employees and supervisors, and that throughout his employment, he kept handwritten notes of the incidents. See Pl.'s Ex. 3. He also testified to the pervasive appearance of to racial slurs on the bathroom walls. Among the epithets that White testified he observed on the bathroom walls, he found at least one that specifically addressed the Plaintiffs' opportunities at New Process: "The three niglets, Darrell, T.J. and Jeff. You niggers will never come up in this plant." See Dep. at 43. He testified that he first complained to management about the graffiti in 1995, but that nothing was done about it until Caraway arrived at the plant in 1997.

White also testifies about specific white employees that were off work for funerals and were not required to provide documentation. In particular, he names James Rice, Jeremy Pickle, Brian (last name unclear), Greg Tolbert, Grant Tolbert, Andy Love and Jesse Reese as white employees who took time off for funerals around the same time as White, and were not required to provide documentation. See Pl.'s Dep. at 96-98. His testimony is circumstantial evidence that

9

he was singled out for differential treatment from white employees.

Defendant argues that the bulk of Plaintiff White's hostile work environment allegations occurred before May 9, 1996, the date of the departure of Martin and Higgins. Because White filed his EEOC charge on March 13, 1998, almost two years later, Defendant asserts that these claims are barred as untimely under the Title VII requirement that an aggrieved employee must file an EEOC charge within 180 days of the alleged violation. However, White's allegations span the length of his employment; for example, the evidence indicates that no action was taken by Defendant to eliminate the racial graffiti in the bathroom until Caraway arrived in September 1997. These allegations constitute a continuing violation and are not barred because White filed a charge within 180 days of the last alleged violation. See Beavers v. American Cast Iron Pipe Co., 975 F.2d 792, 796 (11th Cir. 1992).[6]

Dodson was employed at New Process from March 1997 to February 1998. His claim that he suffered from a racially hostile work environment arises from allegations that two supervisors, Randy and Sammy frequently called him names, and that he also had his hard hat defaced with racial slurs, such as the letters "KKK."

A reasonable jury could conclude from the evidence that the discriminatory atmosphere at New Process was severe and pervasive, such that the conditions of Plaintiffs' employment were affected. Accordingly, the court finds that summary judgment is due to be denied as to these claims.

---

[6] Additionally, even if the court found that White's claim was barred under Title VII, he could still proceed on his hostile work environment claim under § 1981.

C. Retaliation

Plaintiffs allege that they were retaliated against for their complaints of racial harassment with further harassment and scrutiny of their work. White in particular complained to management of the bathroom graffiti, that his hard hats had been stolen, defaced, and burned, and on May 9th he told English that Martin had called him a "nigger."

To state a Title VII claim of retaliation, Plaintiffs must show : 1) they engaged in statutorily protected activity; 2) an adverse employment action; and 3) the adverse action was causally related to their protected activities." See Coutu v. Martin County Bd. Of County Com'rs, 47 F.3d 1068, 1074 (11th Cir. 1995). To engage in a statutorily protected activity, Plaintiffs' "opposition must be directed to an unlawful practice of an employer, not an act of discrimination by a private individual." Silver v. KCA, Inc., 586 F.2d 138, 141 (9th Cir. 1978); quoted in Little v. United Technologies, 103 F.3d 956, 959 (11th Cir. 1997). Plaintiffs' complaints are not protected under Title VII because the conduct that Plaintiffs complained of were acts of racial harassment by co-employees and are not attributable to Defendant. Plaintiffs' protected activities, such as filing EEOC charges and this lawsuit, occurred after their termination from New Process, so that Defendant had no opportunity to retaliate against them for these actions.

Analysis of Plaintiffs' retaliation claim under § 1981 is distinct from the Title VII analysis. See Little, 103 F.3d at 961. Plaintiffs have not, however, offered substantial evidence from which a reasonable jury could conclude that they were retaliated against on account of their race. Summary judgment is due to be granted on Plaintiffs' retaliation claims under both Title VII and § 1981.

11

## Conclusion

Upon consideration, Defendant's motion to supplement is due to be granted and Plaintiffs' motion to strike is due to be denied. Defendant's motion for summary judgment is due to be granted as to Plaintiffs' disparate treatment and retaliation claims. Summary judgment is due to be denied as to Plaintiffs' hostile work environment claims, and this case will continue solely as to those claims.

Dated: February 28, 2000

_____
Judge Sam C. Pointer, Jr.

Service List:
    C. Michael Quinn
    Gregory O. Wiggins
    Tammy L. Dobbs
    Sheldon E. Richie
    Lance J. Ramsey